OPINION OF THE COURT
Herbert J. Adlerberg, J.
On January 22, 1990, the defendant was convicted after a jury trial of the crime of murder in the second degree for intentionally causing the death of Brenda Isaac by stabbing and strangulation. He was sentenced to a prison term of 25 years to life and is currently serving that sentence. The matter is currently on direct appeal to the Appellate Division, First Department.
Defendant now moves to vacate the judgment of conviction pursuant to CPL 440.10 by claiming in substance that the People failed to fulfill their Rosario obligation by neglecting to turn over the autopsy worksheet in the Medical Examiner’s file, in which the Medical Examiner noted the words "neck organs saved”.
On the evening of April 8, 1989, the deceased went to Sweetwater’s with friends to hear a band called Harold Melvin and the Bluenotes. There she met Carlos Railey, the defendant, who was the drummer in the band. After the show, the deceased invited the defendant to stay over in her apartment so he would not have to return to Philadelphia with the rest of the band. They left together with a female friend of the deceased and went to Brooklyn where they deposited the friend. They then returned directly to the deceased’s studio apartment in Manhattan.
The evidence established that the defendant was in fact alone with Brenda Isaac until early in the morning, when Ms. Isaac’s friend, Carol Richardson, spoke to her on the telephone. After that call, the deceased was not heard from or seen alive again.
At about 11:30, the same morning, the defendant entered Sweetwater’s, where he had left some personal belongings the night before. He was wearing blue jeans and a WLIB T-shirt that belonged to the deceased. He spoke to Anna Samaneiga, the production manager, and told her that something terrible had happened the night before, and that a girl had been killed while he was in her apartment last night. He then contacted the police from a pay phone. He called 911 and, according to the tape which was admitted into evidence, reported to the police that his girlfriend had been stabbed about two hours *395 ago. The defendant then flagged down a police car and made a similar report to the officers, who drove the defendant to Midtown North Precinct.
While on the way to the precinct, the defendant recognized and pointed out the building where the deceased lived. It was 400 West 45th Street. At the Midtown North Precinct the defendant was questioned by detectives. One detective, Richard Chartrand, went to the deceased’s apartment and discovered her body.
Brenda Isaac was lying partly on a bed with her feet on the floor. She was fully clothed, except she was not wearing shoes. She had been strangled and the defendant’s white shirt was around her neck. She had also been stabbed 18 times and lay in a pool of blood. In addition to the defendant’s shirt around her neck, the defendant’s gray suit pants were at the foot of the bed on the floor. They were spattered with blood and the area around the knees were saturated with blood.
The defendant gave numerous statements to the detectives. He related that he met the deceased the night before at Sweetwater’s and had gone home with her to spend the night after stopping off at Carol Richardson’s apartment in Brooklyn. He remembered staying up and talking to the deceased and hugging and kissing her on the bed. He claimed that he decided to take a shower around 6:30 a.m. and he took off his pants and shirt. He told Detective Chartrand that he left his shirt on the bed and dropped his pants to the floor at the foot of the bed. He was in the shower 20 to 25 minutes. While he was in the shower he said a strange man came to the door of the apartment and the deceased let him in as if she knew him. After his shower, during which defendant heard no screams or loud sounds, he returned to the bedroom to find the deceased lying on the bed with his shirt around her neck. She had obviously been stabbed several times. Defendant told one detective that he picked up his pants which were on the floor but they were wet. He told another detective that he found his pants on the bed and they were bloody.
The defendant told the detectives he was too nervous to call the police and after feeling for a pulse, he tried but was unable to call 911. He stated he found some clothes of the deceased, the T-shirt and jeans he was wearing when he went to Sweetwater’s later. He left the apartment, tried unsuccessfully to flag down a police car and then took a cab to Sweetwater’s. In substance, five hours had elapsed between his shower at 6:30 a.m. and his arrival at Sweetwater’s at 11:30 a.m.
*396 The Medical Examiner, Dr. Joseph Veress, testified that the cause of death was strangulation, manually and by ligature, as well as 18 stab wounds about the deceased’s chest, face and arms. He testified that the defendant’s white shirt, which was found around the deceased’s neck, was consistent with being a ligature. Dr. Veress also stated that, in his opinion, the stabbing and strangulation occurred somewhat simultaneously and that either the strangulation or stab wounds would independently have caused death. Dr. Veress further testified that his external examination of the deceased revealed several contusions on the face which, in his opinion, were consistent with blunt force trauma.
A forensic expert, Dr. Henry Lee, testified regarding the results of his examination of the items of bloody clothing which were recovered from the scene. He examined the defendant’s shirt found around the deceased’s neck, the defendant’s gray trousers, the blue jeans and T-shirt that defendant had worn when exiting the apartment and were later recovered in a locker at Sweetwater’s. He also examined the crime scene photographs and the autopsy report. Dr. Lee testified that the blood pattern he observed on the defendant’s gray trousers was inconsistent with the defendant’s version of events, to wit: that blood had gotten on the trouser’s because they were on the bed when someone else entered the apartment and stabbed and strangled the deceased while defendant was in the shower. Dr. Lee stated to a reasonable degree of scientific certainty that the pattern of blood stains on the gray trousers was consistent with a person having worn them in close proximity to the deceased at the time of the stabbing. Therefore, defendant must have been wearing the trousers and been in close proximity to the deceased when she was stabbed. Additionally, Dr. Lee concluded that, contrary to defendant’s version, the defendant must have been wearing the victim’s T-shirt at the time she was stabbed because of a blood pattern on it.
The defendant testified that he was showering during the crucial period, and that while in the shower a man entered the apartment and must have strangled the deceased with the defendant’s shirt. He described the man but stated he had never seen him before. He heard no screams or sounds of struggle. He was not able to explain where he was or what had occurred during the approximately five hours commencing with the killing of Ms. Isaac and his subsequent appearance at Sweetwater’s. He further testified that because of a *397 previous medical condition he had little strength in his two little fingers, thus implying he would not have been capable of strangling the victim.
The defense also called David Green, a friend of the victim, in order to establish that Mr. Green had access to the victim’s apartment and might have had a motive to kill her. Mr. Green established that he was at the airport at about the time of the homicide and had not seen the deceased for a period of time.
Subsequent to the defendant’s conviction, and on August 17, 1992, while the case was still on direct appeal, defendant’s appellate attorney subpoenaed all of the documents in the Chief Medical Examiner’s file pertaining to the autopsy performed on Brenda Isaac. Among the materials received from the Office of the Chief Medical Examiner was an autopsy worksheet bearing, under the category "Notes”, the following words: "neck organs saved”.
According to the Assistant District Attorney who prosecuted the defendant, she was, at the time of trial, unaware of the existence of this document, and has since learned that it is an internal form used by the Medical Examiner’s Office, which was not routinely provided to the District Attorney’s Office at the time this case went to trial.
It is the defendant’s present contention that the conceded failure of the People to turn this document over to the defense constituted a violation of the People’s Rosario obligation, and since the case is still on direct appeal, constitutes per se reversible error requiring a new trial. (See, People v Jackson, 78 NY2d 638 [applying the prejudice rule only to those cases where direct appeal has been completed].) Additionally, defendant argues that since the autopsy report, which was turned over to the defense, omitted the detail set forth in the worksheet, to wit: "neck organs saved”, the duplicate equivalent exception to Rosario does not apply. (See, People v Jones, 70 NY2d 547.)
"The law is clear that a violation of the Rosario rule (see, People v Rosario, 9 NY2d 286; CPL 240.45 [1] [a]) cannot be considered harmless error even if the nondisclosed material would have been of limited impeachment value to the defense so that the People’s failure to produce 'constitute[s] per se reversible error requiring a new trial’ (People v Martinez, 71 NY2d 937, 940; see also, People v Jones, 70 NY2d 547; People v Perez, 65 NY2d 154; People v Consolazio, 40 NY2d 446).” (People v Fields, 146 AD2d 505, 508 [1st Dept 1989].)
*398 While the requirements of the Rosario rule are strict, the courts of this State have recognized that not every document automatically falls within the category of Rosario material. The courts have consistently held that disclosure under Rosario is only required when the subject material is within the People’s actual or constructive possession, custody or control. (See, People v Tissois, 72 NY2d 75 [1988] [statements made by a prosecution witness to a social worker for a child welfare agency held not in possession or control of People and were not Rosario material]; People v Fishman, 72 NY2d 884, 886 [1988] [untranscribed plea minutes of prosecution witness not Rosario material where People had "no immediate access of their own” to them]; People v Reedy, 70 NY2d 826 [1987] [victim’s personal written version of crime not in People’s possession or control and not Rosario material]; People v Flynn, 79 NY2d 879 [1992] [accident report filed by complainant with State Department of Motor Vehicles not within prosecutor’s control and not Rosario material despite the fact that Motor Vehicle Bureau is a State agency]; see also, People v Berkley, 157 AD2d 463 [1st Dept 1990] [statement by a rape victim to Victim Service Agency not within People’s possession or control and not Rosario material]; People v Letizia, 159 AD2d 1010 [4th Dept 1990] [victim’s statement to Crime Victim’s Compensation Board not in possession of prosecution and not Rosario material].)
Clearly, documents in the custody of law enforcement agencies such as the police department (People v Ranghelle, 69 NY2d 56, 64 [1986]) or the State Division of Parole (People v Fields, supra) are deemed to be in the constructive possession of the People and must be turned over.
The Fields Court defined the functions of a law enforcement agency. In reversing a conviction because the prosecution failed to turn over to the defense the notes of the defendant’s parole officer the Court said: "a parole officer is an employee of what is, in effect, a law enforcement agency, the State Division of Parole. Pursuant to CPL 2.10 (23), a parole officer is a peace officer with the power to take such action as making warrantless arrests, using physical and deadly force in executing an arrest or preventing an escape, carrying out constitutionally permissible warrantless searches, and possessing and taking custody of firearms not owned by the peace officer for the purpose of disposing or guarding such firearms (CPL 2.20). Moreover, the whole purpose of the parole officer’s interview with [the arresting officer] was to prepare parole *399 violation charges against defendant, and if defendant were, at the conclusion of the appropriate proceedings, ultimately found to be guilty of those charges, he would likely be returned to prison to serve additional time. Violating a person’s parole and sending him back to prison is certainly a prosecutorial function.” (Supra, at 508-509.)
However, not every law enforcement agency can be said to be institutionally controlled by the People so that the People may be deemed to be in constructive possession and control of its documents. The Court of Appeals in the Flynn case (supra) took the view that the Department of Motor Vehicles is not such an agency, despite the fact that investigators of the Department of Motor Vehicles are also designated peace officers by virtue of CPL 2.10 (32).
The Office of the Chief Medical Examiner is an independent agency affiliated for administrative purposes with the Department of Health of the City of New York. (NY City Charter § 557 [a].) Medical Examiners are not qualified as attorneys and do not exercise the powers of peace officers, nor do they possess law enforcement powers of any kind. Rather they are doctors qualified as pathologists and microscopists. (NY City Charter § 557 [a], [c].) Consistent with these qualifications, a principal function of the agency is to officially determine the cause of death when death occurs under any of several identified circumstances (i.e., sudden unexpected natural deaths, including deaths that occur in public and deaths from non-homicidal trauma such as accident or suicide, and deaths which involve criminal violence). (NY City Charter § 557 [fj; Administrative Code of City of NY §§ 17-201 — 17-203.)
The Office of the Chief Medical Examiner is not empowered to bring charges against anyone. The purpose of its investigation is not to determine an individual’s guilt or nonguilt of a crime, and its connection with any criminal prosecution is solely an incident of its duty to render an impartial, scientific determination of the cause of a person’s death. It should be noted that pathologists employed by the Office of the Chief Medical Examiner have, on many occasions, testified for the defense in this and other jurisdictions. Suffice it to say, the Medical Examiner is called as an expert to render an impartial opinion, and is no more in the control of the People than any other expert they might call. The prosecution can do nothing to change or unduly influence that opinion.
In the instant case, as was the practice until very recently, *400 the People turned over the protocol of autopsy to the defense but failed to turn over the Medical Examiner’s entire file which they did not possess and which contained among other things an interoffice memo entitled "Autopsy Worksheet”. New York City Charter §557 (g) requires the Office of the Chief Medical Examiner to deliver to the District Attorney copies of all records relating to every death as to which there is, in the judgment of the Medical Examiner in charge, any indication of criminality. The prosecution in this case, as in a myriad of other homicide cases, was not involved in determining which records would be sent by the Medical Examiner’s Office, and would have no reason to suspect that records required by the City Charter were not sent. Moreover, since the Office of the Chief Medical Examiner is not a prosecutorial agency and has no interest in the outcome of any criminal litigation, its decision about what documents to forward to the District Attorney’s Office could hardly have represented a bad-faith effort to frustrate defendant’s Rosario rights.
In sum, the record at issue, an autopsy worksheet containing the three words "neck organs saved”, was not in the actual or constructive possession, custody or control of the People, since the Office of the Chief Medical Examiner is not a law enforcement agency nor is it an institutional arm of the prosecutorial authorities.
There having occurred no Rosario violation, the defendant’s motion to vacate the judgment of conviction is in all respects denied.