[618 NYS2d 649]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN SMITH, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN JOHNSON, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CARLOS RAILEY, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PASQUAL CARPENTER, Also Known as PASCAL CARPENTER, Appellant.

First Department, November 15, 1994

### APPEARANCES OF COUNSEL

*Henry R. Deutsch* of counsel, New York City *(Philip L. Weinstein,* attorney), for Steven Smith, appellant.

*Diane E. Courselle* of counsel *(E. Joshua Rosenkranz,* attorney), for Steven Johnson, appellant.

*Ira Mickenberg* of counsel *(Howard A. Pincus* and *Vaughn-Michael H. Cordes* on the brief; attorneys), for Carlos Railey, appellant.

*Frank Loss* of counsel *(Philip L. Weinstein,* attorney), for Pasqual Carpenter, appellant.

*Patrick J. Hynes* of counsel, New York City *(Donald J. Siewert* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

CARRO, J.

This is a combined decision in four cases wherein the defendants have appealed, by permission, from orders denying their motions pursuant to CPL 440.10 to vacate judgments convicting them, after jury trials, of murder in the second degree. Each defendant claims that the prosecutor's failure to

turn over to the defense an audiotape or worksheet, prepared by a Medical Examiner as an aid in rendering the Medical Examiner's final autopsy report on the cause of the victim's death, requires our vacating his conviction. The underlying facts in each case, and the governing legal principles, which in our view require affirmance of each order appealed from, are as follows.

## *People v Steven Smith*

Defendant Steven Smith was convicted after a jury trial in the Supreme Court, New York County (James Leff, J.), of two counts of murder in the second degree and one count each of rape in the first degree, sodomy in the first degree, and robbery in the first degree. On November 20, 1989 he was sentenced to concurrent indeterminate prison terms of 25 years to life on the murder convictions, and 8⅓ to 25 years on the other three convictions, with the latter sentences running consecutively to each other and to the terms imposed on the murder convictions. The convictions stemmed from Smith's murder and sexual assault on January 7, 1989 of Dr. Kathryn Hinnant, a recently married physician who was five months' pregnant.

On the night in question Smith, who was secretly living as a squatter in Bellevue Hospital, entered Dr. Hinnant's office and subjected her to a brutal beating, after which he raped and anally sodomized her, stole her jewelry and other personal belongings, and strangled her to death. Smith then went to the men's shelter on Ward's Island where he told a friend and other shelter residents what he had done, expressed a desire to leave town, and enlisted their assistance in selling the property he had stolen. Smith's friend and two other shelter residents came forward and disclosed Smith's admissions, leading to his arrest. Smith was convicted upon his admissions, and physical evidence, including his blood-stained clothing and a blood-stained electrical cord that he used to strangle Dr. Hinnant, Dr. Hinnant's personal property that had been stolen during the murder and traced to Smith, Smith's fingerprints recovered from Dr. Hinnant's office, and DNA tests which matched the DNA from semen samples recovered from Dr. Hinnant's vagina and dress, with Smith's DNA. At trial the defense interposed was that Smith had committed the acts charged, but that he was not responsible for his actions because of mental disease or defect.

On October 21, 1993 Smith moved to vacate his conviction on the ground that Dr. Yury Kogan, the Assistant Medical Examiner who had testified at trial concerning the autopsy performed on the body of Dr. Hinnant, had made an audiotape of his observations while performing the autopsy, which was not supplied to defense counsel. Smith contended that the tape was *Rosario* material *(People v Rosario,* 9 NY2d 286, *cert denied* 368 US 866) which the People were required to obtain from the Office of the Chief Medical Examiner (hereafter OCME) and provide to the defendant without request. The *Rosario* rule has been codified in CPL 240.45 (1) (a), which provides:

"1. After the jury has been sworn and before the prosecutor's opening address, or in the case of a single judge trial after commencement and before submission of evidence, the prosecutor shall, subject to a protective order, make available to the defendant:

"(a) Any written or recorded statement, including any testimony before a grand jury and an examination videotaped pursuant to section 190.32 of this chapter, made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony."

Although the cause of death was never in issue at trial, Smith argued that the court was required to vacate his conviction without regard to the absence of prejudice to the defense, pursuant to *People v Jackson* (78 NY2d 638). The People opposed on the ground, *inter alia,* that the audiotape had never been in the possession or control of the local prosecutor *(People v Flynn,* 79 NY2d 879). On November 23, 1993, Justice Leff summarily denied the defendant's motion without opinion. On January 25, 1994, a Justice of this Court granted Smith's application pursuant to CPL 460.15 for a certificate granting leave to appeal from Justice Leff's order.

### People v Steven Johnson

Defendant Steven Johnson was convicted after a jury trial in the Supreme Court, New York County (Daniel P. FitzGerald, J.), of murder in the second degree, and one count each of criminal possession of a weapon in the second and third degrees. On September 18, 1991 he was sentenced as a second violent felony offender to concurrent indeterminate prison

terms of 25 years to life, 7½ to 15 years, and 3½ to 7 years, respectively.

On the evening of February 16, 1990, Steven Johnson and Ramon Almonte, both armed with handguns, approached Raphael Reyes and his uncle on the street. Reyes tried to run away, but Johnson chased him down and shot him three times, killing him. In addition to two eyewitnesses who identified Johnson as the shooter, another witness testified that immediately after the murder Johnson came to her apartment, admitted to the shooting, and hid the murder weapon in her kitchen. Johnson presented an alibi defense, but a rebuttal witness testified that Johnson had attempted to enlist her support in presenting a false alibi, and threatened her when she refused to lie for him. The cause of death was not an issue at trial.

On March 3, 1993 Johnson moved for an order vacating his conviction pursuant to CPL 440.10 on the ground that an audiotape dictated by Dr. Beverly Leffers, the forensic pathologist, which a typist had transcribed to become part of the autopsy report, was not turned over to the defense. Prior to the trial, in accordance with standard procedure in homicide cases, the OCME delivered to the District Attorney's office their file relating to the death of Reyes. Included in that file, and turned over to the defense, were numerous written documents pertaining to the autopsy of Reyes, including the written autopsy report and the written notes of the pathologist. The audiotape was not included in the file, and it was not delivered to the District Attorney's office. The question thus presented was whether the audiotape, in the possession of the OCME, was within the control of the local prosecutor (*People v Flynn,* 79 NY2d 879, 882, *supra*). On December 31, 1993, Justice FitzGerald denied Johnson's motion in a written opinion, finding that the OCME is not a law enforcement agency, and that various statutes requiring the OCME to cooperate with the District Attorney's office in homicide cases do not require a finding that the audiotape was in the constructive possession of the local prosecutor. A Justice of this Court granted Johnson's application for a certificate granting him leave to appeal from Justice FitzGerald's order.

## People v Carlos Railey

Defendant Carlos Railey was convicted after a jury trial in the Supreme Court, New York County (Herbert J. Adlerberg,

J.), of murder in the second degree. On February 14, 1990 he was sentenced to an indeterminate prison term of 25 years to life.

On the night of April 8, 1988 Railey, a drummer with a musical group, met Brenda Lee Isaac at a Manhattan night-club where his band was performing. Ms. Isaac invited Railey to spend the evening at her apartment so that he would not have to return to Philadelphia with the rest of the band that night. The essence of the murder charge was that sometime during the morning hours of April 9 Railey strangled Ms. Isaac with his shirt and stabbed her 18 times, killing her. His defense was that a man was allowed into the apartment by Ms. Isaac at 6:30 A.M., while Railey was in the shower, and that Railey found her on the bed, stabbed and strangled, when he finished his shower. He testified that he was unable to call the police for approximately five hours because he did not know the address of the crime scene and was unable to flag down a police car during that period.

On August 17, 1992, while Railey's appeal was pending, his appellate attorney subpoenaed all the documents in the Chief Medical Examiner's file and discovered an autopsy worksheet bearing, under the category "Notes", the words "neck organs saved." Railey then moved pursuant to CPL 440.10 to vacate his conviction on the ground that the People had failed to fulfill their *Rosario* obligation. On November 15, 1993, Justice Adlerberg denied the motion in a written opinion (159 Misc 2d 393) and leave to appeal from that order was thereafter granted by a Justice of this Court.

### People v Pasqual Carpenter

Defendant Pasqual Carpenter was convicted after a jury trial in the Supreme Court, New York County (Edwin Torres, J.), of murder in the second degree and two counts each of robbery in the first and second degrees. On January 3, 1992 Carpenter was sentenced to concurrent indeterminate prison terms of 25 years to life for the murder, 8⅓ to 25 years on the first degree robbery counts, and 5 to 15 years on the second degree robbery counts.

At about 10:00 P.M. on September 2, 1990 Carpenter and six friends decided to commit a robbery at the subway station located at 57th Street and Seventh Avenue in Manhattan because several among the group did not have enough money to pay their way into Roseland, a midtown dance hall. As

Carpenter stood as lookout, the others surrounded Brian Watkins and his family, visitors from Provo, Utah, on the subway platform and attacked them. Sherwin Watkins, Brian's father, was knocked to the platform and, as one attacker held him down, another slashed his pants with a knife, cutting Mr. Watkins in the leg. Karen Watkins, Brian's mother, was pulled to the platform by her hair, and kicked in the face and chest. As Brian Watkins rushed to her defense he was grabbed by the neck from behind by Yull Gary Morales, one of Carpenter's accomplices, and stabbed in the chest with a knife, causing his death. The robbers then took approximately $200 seized from Sherwin Watkins and went to Roseland where they spent the night dancing. Carpenter later admitted that he had acted as a lookout during the robbery and had restrained a woman at the scene to keep her from interfering.

On September 8, 1993, almost two years after his conviction, Carpenter moved pursuant to CPL 440.10 to vacate his conviction on the ground that the People had failed to fulfill their *Rosario* obligation because an audiotape describing the Medical Examiner's autopsy findings had not been turned over to the defense at trial. The People opposed the motion on the ground that the audiotape had been in the sole possession of the OCME, and was never in the actual or constructive possession of the prosecutor. On October 13, 1993 Justice Torres denied Carpenter's motion without opinion, and leave to appeal from that order was thereafter granted by a Justice of this Court.

These four cases, each of which is also pending before this Court on direct appeal from the judgments of conviction, are the first to reach this Court presenting the question whether an audiotape or worksheet made by a Medical Examiner who performed an autopsy and testified as a People's witness at trial, is *Rosario* material. This question was recently answered in the negative by the Appellate Division, Second Department, in the first reported appellate decision addressing the issue *(People v Washington,* 196 AD2d 346 [Apr. 4, 1994]). By stipulation, the appeals from the denials of the defendants' CPL 440.10 motions, which raise this issue, were heard in advance of the direct appeals. Although each defendant's brief was prepared by different counsel, and thus the arguments supporting the defendants' positions vary slightly from each other, we deem it appropriate, in view of the circumstance that the appeals were consolidated for argument and the

objective nature of the findings that determine the issues presented, to give each defendant the benefit of any argument raised by any of the other defendants.

In each case the defendant was convicted of murder after trial at which a Medical Examiner (hereafter ME) testified for the People. In each case, although the autopsy report was disclosed in accordance with law (CPL 240.20 [1] [c]), it was discovered after trial that the ME had made either an audiotape or worksheet from which the autopsy report was prepared. In each case the preparatory materials remained at all times pertinent hereto in the sole custody of the OCME, and were not disclosed or turned over to the prosecutors or defense counsel.

In *People v Rosario* (9 NY2d 286, 289, *supra)* the Court of Appeals recognized that when "a witness for the prosecution has made a statement, to police, district attorney or grand jury" that relates to the subject of the witness' testimony, defense counsel will wish to examine that statement to impeach and discredit the witness, and that "a right sense of justice" requires the prosecutor to turn over to the defense any such statement. While the Court of Appeals applied a harmless error analysis to affirm the defendant's conviction in that case, the Court of Appeals subsequently held that a complete failure to turn over *Rosario* material, no matter how trivial the consequence to the defendant's case, and regardless of the prosecutor's good faith, requires reversal per se *(People v Ranghelle,* 69 NY2d 56).[1]

"The law is clear that a violation of the *Rosario* rule * * * cannot be considered harmless error even if the nondisclosed material would have been of limited impeachment value to the defense so that the People's failure to produce 'constitute[s] per se reversible error requiring a new trial' *(People v Martinez,* 71 NY2d 937, 940; *see also, People v Jones,* 70 NY2d 547; *People v Perez,* 65 NY2d 154; *People v Consolazio,* 40 NY2d 446)." *(People v Fields,* 146 AD2d 505, 508.) Accordingly we are prohibited from applying harmless error analysis

---

1. The rigid *Ranghelle* rule has its critics, most notably because it exalts a State procedural rule regarding errors collateral to guilt or innocence above many errors of constitutional magnitude, and seemingly runs contrary to the legislative direction to appellate courts contained in CPL 470.05 (1): "An appellate court must determine an appeal without regard to technical errors or defects which do not affect the substantial rights of the parties." *(See, People v Jones,* 70 NY2d 547, 553-557 [Bellacosa, J., concurring].)

herein despite the fact that the cause of death in each case was never in issue, and the differences between the information in the audiotapes and worksheet as compared to the final autopsy reports, insofar as they have been described in the briefs, are utterly trivial and immaterial, and could not possibly have affected the results.

The Court of Appeals has "consistently held that the People's *Rosario* obligation to produce the pretrial statements of prosecution witnesses is limited to material which is within their possession or control [citations omitted]." *(People v Flynn,* 79 NY2d 879, 882, *supra.)* Documents in the custody of law enforcement agencies such as the police department *(People v Ranghelle, supra)* or the State Division of Parole *(People v Fields, supra)* are deemed to be in the constructive possession of the People and must be made available to the defense.

Defendants argue here that audiotapes and worksheets prepared by the OCME, and kept within that agency's custody, are constructively within the People's *possession,* because the OCME performs a "prosecutorial function" in that it generates material "during the course of the primary criminal investigation", and it is therefore a "vital part of the prosecutorial team" in homicide cases. Defendants also argue that the local prosecutor has been given statutory access to, and thus *control* over, prior statements of prosecution witnesses contained in material generated by the OCME as part of a homicide investigation. We find neither argument persuasive.

This Court has recently held that a defendant in a murder case was not entitled to an adverse inference charge as a result of the OCME's failure to preserve a blanket in which the murder victim's body was found wrapped, because "the failure to preserve the evidence was attributable to the Medical Examiner's Office, not law enforcement personnel." *(People v Santiago,* 200 AD2d 370, *lv denied* 83 NY2d 876.) And in *United States v Rosa* (11 F3d 315, *cert denied* — US —, 114 S Ct 1565) the United States Court of Appeals for the Second Circuit held that rule 803 (8) (B) of the Federal Rules of Evidence, excluding from evidence reports prepared by "law enforcement personnel", did not apply to a written autopsy report prepared by an employee of the OCME.

The OCME is an independent agency affiliated for administrative purposes with the New York City Department of Health (NY City Charter § 557 [a], [c]). Medical Examiners do not exercise the powers of peace officers, or exercise any other

law enforcement powers, and have no authority to bring charges against anyone *(cf., People v Fields,* 146 AD2d 505, 508-509, *supra).* Rather, they are doctors qualified as pathologists and microscopists (NY City Charter § 557 [a], [c]; *People v Washington,* 196 AD2d 346, 350, *supra).* The principal function of the OCME is to officially determine the cause of death under several specified circumstances (i.e., "from criminal violence, by casualty, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner" [NY City Charter § 557 (f); *see,* Administrative Code of City of NY §§ 17-201, 17-202, 17-203]). The sole purpose of the OCME's investigations is "to give an impartial scientific determination of the cause of a person's death and not to determine whether an individual is guilty, or not guilty, of a crime" *(People v Washington,* 196 AD2d 346, 350, *supra; see also, People v Railey,* 159 Misc 2d 393, 399, *supra; United States v Rosa,* 11 F3d 315, 332, *supra).* Thus the OCME's connection with any criminal prosecution is merely an incident of its duty to render impartial, scientific determinations with respect to the cause of a person's death and related matters of forensic science. In this regard, it has been observed that "pathologists employed by the Office of the Chief Medical Examiner have, on many occasions, testified for the defense in this and other jurisdictions" *(People v Railey, supra,* at 399).

In *People v Flynn* (79 NY2d 879, *supra),* the defendant argued that a motor vehicle accident report filed by the complainant with the Department of Motor Vehicles (DMV) was *Rosario* material based on that agency's law enforcement functions (DMV investigators are designated peace officers [CPL 2.10 (32)], and the DMV is involved in the adjudication of offenses resulting in fines and license revocations). The Court of Appeals reiterated that "the People's *Rosario* obligation to produce the pretrial statements of prosecution witnesses is limited to material which is within their possession or control [citations omitted]. Material in the possession of a State administrative agency, such as the Department of Motor Vehicles, is not within the control of a local prosecutor" *(People v Flynn, supra,* at 882). Although the Court of Appeals in *Flynn* spoke in terms of the People's "control" over DMV documents, that case also impliedly disposes of defendants' contention that OCME documents are in the constructive possession of the People. Our analysis of the pertinent precedents and an overview of the institutional character of the

OCME as defined by statute, and its relationship to the prosecution in homicide cases, is persuasive that documents in the possession of the OCME are not in the constructive possession of the People.

The defendants argue alternatively that even if audiotapes and worksheets prepared by the OCME and kept within that agency's custody are not deemed to be in the People's constructive possession, the People nevertheless have control over such materials because the local District Attorney is given access to them pursuant to statute. In particular, defendants point to New York City Charter § 557 (g) which compels the OCME to "promptly deliver to the appropriate District Attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality." Further, while the Administrative Code specifies the nature of records to be kept on file (see, Administrative Code §§ 17-203, 17-205), the District Attorney and the Police Commissioner "may require from the chief medical examiner such further records, and such daily information, as they may deem necessary" (Administrative Code § 17-205).

We agree with the conclusion reached by the Appellate Division, Second Department, in *People v Washington (supra,* at 351) that "[t]he mere fact that the District Attorney has access to records generated by OCME does not rise to the level of control required under the *Rosario* rule", and add the following observation to that Court's analysis. If OCME records were deemed to be within the control of the local prosecutor merely because the prosecutor is entitled to get a copy of it upon request, then *every* record in the possession of *any* City agency would have to be deemed in the prosecutor's "control", because County Law § 932 gives the District Attorneys in New York City the right to obtain a copy of any record in any City agency.[2] As it relates to prosecutorial control of witness statements in the sole possession of the OCME, Administrative Code § 17-205 adds nothing to the record access to which the District Attorney is entitled under

---

2. County Law § 932 provides in pertinent part that every salaried officer of New York City and the counties it comprises "must, upon application therefor, furnish to the district attorney of any of the said counties, a certified or exemplified copy or transcript of, or extract from, or transcript of any writing, paper, record or document on file or recorded in his office, or of the return upon an execution, mandate or order, without the payment of any fee or charge whatsoever therefor."

County Law § 932. Neither reason nor precedent supports a determination that in principle would require per se reversal of any case in which a City employee failed to turn over a witness's prior statement to the local prosecutor on the theory that the prosecutor was entitled to access to that record.

Defendants' related argument that the People should be required to turn over "any prior statements of a prosecution witness that are contained in the records of a governmental agency that becomes involved in a local criminal investigation on the side of the prosecution," and that the issue of prosecution control over statements in the custody of non-law enforcement agencies should be decided on a "case-by-case basis," is unfounded in law and would be unworkable in practice. That approach would inject an unwarranted degree of uncertainty into a discovery process that is already so exacting that the smallest misstep, even if only so regarded in appellate hindsight, is alone sufficient to vacate a conviction, despite the prosecutor's good faith, and the absence of prejudice to the defendant.

Our approval of this analysis would also constitute an unwarranted abandonment of the clear guidelines offered by current law, under which a particular agency's records are categorically regarded as either under the People's control or outside it, and would substitute a burdensome, case-by-case inquiry (apparently to include an evidentiary hearing if the defendant demands one) into the nature and extent of the agency's connection to the particular case.

Accordingly, the orders of the Supreme Court, New York County, entered November 23, 1993 (James J. Leff, J.) (Smith); December 31, 1993 (Daniel P. FitzGerald, J.) (Johnson); November 15, 1993 (Herbert J. Adlerberg, J.) (Railey); and October 13, 1993 (Edwin Torres, J.) (Carpenter), denying the defendants' CPL 440.10 motions, should be affirmed. Motions by the People (M-2541, M-2542) to strike the appendices submitted by appellants Carpenter and Smith, and all references to matter dehors the record in their briefs, are granted (see, People v Washington, 196 AD2d 346 [granting similar motion by respondent in that case]). The Appendix materials were obtained by the Legal Aid Society in January of 1994, in an unrelated case pending in the Bronx, several months after the Supreme Court entered the orders appealed from herein. Since these materials were not before the Justices who decided the motions, they are not a part of the record on appeal, and may not be considered by this Court (see, Terner v Terner, 44 AD2d

702; *Block v Nelson,* 71 AD2d 509, 511; *Chimarios v Duhl,* 152 AD2d 508; *People v Noland,* 189 AD2d 829, *lv denied* 81 NY2d 890).

MURPHY, P. J. (dissenting). In the aftermath of a homicide the Office of the Chief Medical Examiner (hereinafter OCME or the "medical examiner") is required by law to "take charge of the dead body" and "fully investigate" the cause of death (Administrative Code of City of NY § 17-202 [a]). In the course of this investigation the medical examiner must take possession of and deliver to the police objects from the crime scene probative of the way in which the death occurred *(ibid.)* and may "administer oaths and take affidavits, proofs and examinations" (NY City Charter, ch 22, § 557 [e]). The medical examiner must also perform an autopsy and related examinations (Administrative Code § 17-203; Public Health Law § 4210 [2] [c]) and must "promptly deliver to the appropriate district attorney copies of *all* records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality" (NY City Charter, ch 22, § 557 [g]; emphasis added). Nor is this the end of the medical examiner's duty to investigate and report, for subsequent to the delivery of the autopsy and other examination records, the medical examiner may be required to supply to the District Attorney or Police Commissioner "such further records, and such daily information, as they may deem necessary" (Administrative Code § 17-205).

From the foregoing it would seem clear that if the medical examiner has complied with his statutory obligations, he will, by the time of any murder trial have forwarded to the appropriate prosecutor *all* autopsy and other records relating to the victim's death. It is additionally clear that once these records have been delivered to the prosecutor, the prosecutor will in turn be required, pursuant to statute and well-settled case law, to deliver to the defense any nonconfidential written or recorded statements of prosecution witnesses found in those records relevant to the testimony those witnesses will be called upon to provide (CPL 240.45 [1] [a]; *People v Rosario,* 9 NY2d 286, *cert denied* 368 US 866).

An OCME pathologist is, almost invariably, called to testify at the trial of one accused of criminally taking another's life, the pathologist's testimony being essential to establish, among other things, the cause, circumstances and time of death and, often, the identity of the perpetrator. Accordingly, effective

cross-examination of the pathologist will in many cases be vital to the defendant's prospects for acquittal. We have in this State recognized that "a right sense of justice" requires that as the defendant and his counsel set about the business of cross-examining and attempting to impeach witnesses for the prosecution, they be afforded the "full benefit" of prior recorded statements of those witnesses—at least to the extent that such statements are within the prosecutor's possession or control (People v Rosario, supra, at 289; People v Poole, 48 NY2d 144, 149; People v Perez, 65 NY2d 154, 158; People v Ranghelle, 69 NY2d 56, 62). And, as should be evident, if the law has been followed by the medical examiner, the prosecutor will indeed have in his or her possession all of the medical examiner's prior recorded statements respecting the death as to which he or she has been called upon to give evidence at trial. The defendant then has every reason to expect that by the time of cross-examination, if not before (see, CPL 240.45 [1] [a]), he or she will receive from the prosecutor all of those statements. It is in fact only if there has been some failure either by the medical examiner or the prosecutor to comply with the law that a defendant will be deprived of all of the medical examiner's previous written or recorded statements for use in cross-examination.

In the cases at bar it is clear that the medical examiner did not in fact deliver to the prosecution "all records relating to every death as to which there [was], in the judgment of the medical examiner in charge, any indication of criminality" (NY City Charter § 557 [g]; emphasis added) and that the prosecution, not having received all such records, did not turn over to the defendants all of the medical examiner's prior recorded statements respecting the homicides of which the defendants were accused and about which the medical examiner would testify as a prosecution witness; in three of the four cases it would appear that audiotape recordings containing the medical examiner's contemporaneous account of the autopsy performed on the homicide victim were not turned over to the prosecutor and in the remaining case that an autopsy worksheet was omitted from the records delivered by the medical examiner to the prosecutor. The People do not in the main contend that these materials were properly withheld by the medical examiner[1] or that, had they been turned over

---

1. Although the People do allude to a "policy" of the medical examiner pursuant to which certain materials were not delivered to the prosecution,

to the prosecution, as they should have been, the prosecution would not then have been obliged to make the tapes and worksheet available to the defense for use in cross-examination. It is rather the People's principal contention that they were not responsible for the disclosure of the subject materials because the materials were never transferred by the medical examiner either to the prosecution or to the police.[2] According to the People, then, the fault, if there is any, lies entirely with the medical examiner and is not addressable as a *Rosario* violation.

The People's assignment of fault, even if correct, does not alter the fact that material which should have passed to defendants as *Rosario* material did not. Indeed, the irreducible fact is that although the defendants were entitled by law to copies of the autopsy tapes and worksheets, they did not receive them and, accordingly, were unable to use them in cross-examining the OCME pathologists called by the People. While the majority pronounces quite confidently that the subject materials could not possibly have been of value to the defendants, this is a judgment which it may not make. The central and still valid teaching of *Rosario (supra,* at 289-290) is that it is the function of counsel for the accused, not the court, to assess the utility for defense purposes of prior statements of prosecution witnesses. Accordingly, it is the rule that neither the trial court nor an appellate panel may substitute its assessment of evidentiary utility for that of defense counsel; just as a trial court may not prescreen the prior statements of prosecution witnesses to determine which are appropriate for use in cross-examination *(People v Rosario, supra,* at 289), neither may an appeals court retrospectively excuse the failure to turn over *Rosario* material upon the speculation that counsel could not have used the withheld material to his client's advantage *(People v Jones,* 70 NY2d 547, 550). All *Rosario* material must, therefore, be turned over to defense counsel prior to cross-examination and the failure to do so will, subject to certain closely drawn exceptions, result in appellate reversal, even though appellate Judges such as my colleagues on this panel are unable to perceive the failure as

there is no evidence of any such policy before the Court. Moreover, even if there were such a policy it would not be legally sustainable given the governing statute's clear direction that *all* the medical examiner's homicide records be delivered to the appropriate prosecutor.

2. It is conceded that if the subject materials had been delivered to the police, the prosecutor would be responsible for their production.

prejudicial *(People v Consolazio,* 40 NY2d 446, 454; *People v Jones, supra).*

There is no question that the present defendants have all been denied the use in cross-examination of material which should have passed to them from the People in satisfaction of the People's disclosure obligations pursuant to *People v Rosario (supra).* Upon what ground then are these defendants to be denied the remedy afforded other defendants from whom *Rosario* material has been withheld? None is offered either by the majority or the People except that the failure to disclose the tapes and worksheet was at its inception the fault of the medical examiner. It can, however, matter not at all to the basic fairness of a murder trial that material to which the defendant was entitled in order effectively to cross-examine the pathologist who investigated the death and performed the autopsy upon the victim, was withheld in the first instance by the medical examiner rather than the prosecutor. Regardless of who was first at fault, the result was to deprive the defense of material it was entitled to receive from the prosecution for use in cross-examination. This was material of a sort whose transfer to the defense prior to cross-examination the courts of this State have deemed categorically essential to a fair trial and there exists no principled basis for denying the within defendants the remedy ordinarily mandated when material which should be disclosed as *Rosario* material is withheld.

It is precisely to avoid a result as arbitrary and anomalous as that embraced by the majority that the People's disclosure obligation under *Rosario (supra)* has been held to extend not merely to material within their actual possession, but in addition to material within their control *(People v Perez, supra,* at 158-159; *People v Ranghelle, supra,* at 64). Thus, as here, the People may not claim an exemption from their obligation to disclose material pursuant to *Rosario* simply because the material did not of its own find its way as it should have into the prosecutor's files. Where the prior statements of a prosecution witness upon the subject matter of his or her testimony are readily ascertainable by the prosecutor in the ordinary course of preparing his or her case for trial, the statements must be located by the prosecutor and produced to the defendant *(see, People v Ranghelle, supra,* at 64). Any less demanding rule would seriously compromise society's interest in maintaining criminal trials as truth-finding processes *(supra).* This is particularly so respecting disclosure of records generated by the OCME, for while the prosecutor is

given unfettered access to *all* OCME records relating to a homicide and, indeed, should actually have all such records promptly delivered to him in accordance with the statute, the defendant charged with the homicide is not afforded comparable access. The defendant, moreover, given the statutory and common-law disclosure obligations of both the medical examiner and the prosecutor, may justifiably rely upon the prosecutor diligently to review the entire OCME file pertinent to a homicide of which he has been accused and deliver all *Rosario* material found in that file to the defense. If the prosecutor does not insist, as he should in the ordinary course of his prosecutorial duties, upon receiving from OCME all records respecting the death which has become the subject of the prosecution, it may well be that extremely critical material absolutely essential both to the prosecution and to effective cross-examination by the defense, and in either case to the integrity of the trial as a truth-finding exercise, will never be brought to light. It is, in fact, precisely to records such as those generated by OCME that the *Rosario* disclosure obligation must extend if it is in any real sense to fulfill its purpose of safeguarding the truth-seeking process.

The People, in any case, make no argument demonstrating that they did not have control over all of OCME's records respecting the homicides for which the defendants were tried, including the autopsy audiotapes and worksheets. Obviously, given the aforecited statutory provision no such argument can be made. Indeed, it is clear that the People have every bit as much control over the homicide records of the medical examiner as they have over forensic records generated by the police laboratory which are indisputably subject to disclosure pursuant to *Rosario*. Rather, the People argue that OCME is not a police agency and that they have no responsibility to seek out and produce materials found in agencies whose principal institutional mission is not law enforcement. Suffice it to say that the sweeping and completely arbitrary exemption claimed by the People finds no support in case law which consistently extends the People's disclosure obligation to materials within the People's control. Doubtless, if it had been the intention of the Court of Appeals to limit the People's obligation in the manner contended by the People, it would have done so; the claimed limitation is after all relatively easy to express. That the Court of Appeals has not done so is plainly attributable to the circumstance that, as distinguished from the limiting concept of control, the limitation proposed by the

People has nothing to do with the ends the *Rosario* disclosure obligation was intended to promote. As noted, far from providing some reasonable assurance as to the integrity of the truth-seeking process, the limitation the People propose will likely impair it. The rule advanced by the People is, in the end, simply one of convenience.

It is, of course, highly disquieting that the combined failure of the People and the medical examiner to avail the defense of OCME material which it should have had, may render infirm not only the convictions at bar but, if the People's representations are correct, numerous others. It should, however, be at least equally disquieting that a rule of disclosure deemed essential to the fairness of criminal trials has apparently been long and widely disregarded, raising the distinct possibility that numerous persons have been wrongfully convicted and penalized for the commission of most serious crimes.

Accordingly, the orders of the Supreme Court, New York County, entered November 23, 1993 (James J. Leff, J.) (Smith); December 31, 1993 (Daniel P. FitzGerald, J.) (Johnson); November 15, 1993 (Herbert J. Adlerberg, J.) (Railey); and October 13, 1993 (Edwin Torres, J.) (Carpenter), denying the defendants' CPL 440.10 motions, should be reversed, and the motions granted to the extent of remanding each case for a hearing to determine whether the *Rosario* materials which were disclosed were the duplicative equivalent of those which were not disclosed.

ELLERIN, WALLACH and RUBIN, JJ., concur with CARRO, J.; MURPHY, P. J., dissents in a separate opinion.

Orders, Supreme Court, New York County, entered November 23, 1993, December 31, 1993, November 15, 1993, and October 13, 1993, affirmed.