[618 NYS2d 645]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICARDO NOVA, Appellant.

First Department, November 15, 1994

APPEARANCES OF COUNSEL

*David Touger* of counsel, New York City *(Peluso & Touger,* attorneys), for appellant.

*Donald J. Siewert* of counsel, New York City *(Patrick J. Hynes* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

Ross, J.

By a judgment of Supreme Court, New York County (Edwin Torres J.), rendered January 3, 1992, defendant-appellant Ricardo Nova, along with six other individuals, was convicted of murder in the second degree and related crimes in connection with an attack on the Watkins family on September 2, 1990, which resulted in the death of Brian Watkins from a deep stab wound to the chest, inflicted by Nova's accomplice Yull Gary Morales. While Brian Watkins was the only fatality, the other members of his family were either slashed, or kicked and beaten by the group of teenagers who committed these atrocities in order to obtain money to go dancing at Roseland. The defendant was sentenced to 25 years to life in prison for the murder. On direct appeal, Nova's conviction was affirmed by order of this Court entered November 30, 1993 *(People v Nova,* 198 AD2d 193, *lv denied* 83 NY2d 808). By motion dated September 8, 1993, Nova moved, pursuant to CPL 440.10, for an order vacating the judgment of conviction on the ground that an audiotape made by the pathologist during the autopsy of Brian Watkins' body constituted *Rosario* material *(see, People v Rosario,* 9 NY2d 286; *see also,* CPL 240.45 [1] [a]), and that the failure to disclose the tape required reversal and a new trial pursuant to *People v Ranghelle* (69 NY2d 56). By order of Supreme Court, New York County (Edwin Torres, J.), entered October 13, 1993, that motion was denied. Permission to appeal that order was granted by a Justice of this Court. For the following reasons we unanimously affirm the October 13, 1993 order and hold that the audiotape in question is not *Rosario* material.

In *People v Rosario (supra,* at 289), it was held that a "right sense of justice" requires that the prosecution turn over to the defense any statement made by a prosecution witness to the police, District Attorney or Grand Jury that relates to the subject matter of the witness' testimony. Since *People v Ranghelle (supra),* it has been the law in this State that the

People's complete failure to provide *Rosario* material to the defense constitutes per se reversible error requiring a new trial *(People v Martinez,* 71 NY2d 937, 940; *see, People v Jones,* 70 NY2d 547; *People v Perez,* 65 NY2d 154).

However, it has been consistently held by the Court of Appeals that the People's obligation to produce the pretrial statements of their witnesses is limited to material which is in their possession or control *(People v Flynn,* 79 NY2d 879, 882). Traditionally, documents in the possession of law enforcement agencies have been deemed to be in the constructive possession of the People and are required to be produced.

For example, in *People v Ranghelle (supra),* the failure to turn over a precinct complaint report containing a synopsis of the complainant's allegations against the defendant, before the close of the evidence, was held to be per se reversible error. The Court noted that the existence of a complaint report filed with the police was readily available to the People and held that, "the burden of locating and producing prior statements of complaining witnesses, filed with police agencies, remain[s] solely with the People" *(People v Ranghelle, supra,* at 64). In *People v Fields* (146 AD2d 505), this Court held that the notes of a parole officer constituted *Rosario* material, which the People were required to produce. In holding that a parole officer was a member of law enforcement it was noted that, "a parole officer is a peace officer with the power to take such action as making warrantless arrests, using physical and deadly force in executing an arrest or preventing an escape, carrying out constitutionally permissible warrantless searches, and possessing and taking custody of firearms not owned by the peace officer for the purpose of disposing or guarding such firearms [citation omitted]" *(supra,* at 508). It was also noted that the parole officer's function of determining if parole violation charges are to be filed against a person in order that he or she may be sent back to prison is "certainly a prosecutorial function" *(supra,* at 508-509).

Defendant, herein, raises the same arguments as were raised and rejected by the Second Department in *People v Washington* (196 AD2d 346, *lv granted* 83 NY2d 1008). Here, as in *Washington,* the defendant bases his argument that the Office of the Chief Medical Examiner (OCME) performs "prosecutorial functions" on the facts that the New York City Charter and the New York City Administrative Code require the OCME to make certain determinations regarding the cause of death (NY City Charter § 557 [f]; Administrative Code

§§ 17-203, 17-205), and to maintain certain records and provide same to law enforcement and the prosecutor's office (NY City Charter § 557 [g]; Administrative Code § 17-205).

However, upon our review of these Charter and Administrative Code provisions, we conclude, in accordance with *People v Washington (supra),* that the OCME is neither an agency of law enforcement, nor in any manner under the control of the local prosecutors' offices. Pursuant to New York City Charter § 557 (a) and (c), the OCME was created as an independent agency affiliated for administrative purposes with the Department of Health of the City of New York. The Medical Examiners who staff OCME are doctors who are qualified as pathologists and microscopists. Unlike the officers of the State Division of Parole, they are not peace officers and do not have any of the powers of peace officers. "[T]he principal function of OCME is to officially determine the cause of death when death occurs under any one of several distinct circumstances, i.e., 'from criminal violence, by casualty, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner' (NY City Charter § 557 [f]; *see also,* Administrative Code of City of NY §§ 17-201, 17-203)" *(People v Washington, supra,* at 350).

It is required that the OCME deliver to the District Attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality (NY City Charter § 557 [g]). This requirement to furnish information does not place the OCME under the control of the prosecutor's office for the purposes of *Rosario (supra)* or for any other purposes. It has been noted that nothing in the Charter or Administrative Code requires the OCME to make or retain audio tapes of autopsies. Further, the District Attorney has no control over the form of the records kept by the OCME or over which records are provided to it *(see, People v Washington, supra,* at 351).

There is nothing unique in this arrangement. Numerous other governmental agencies are required to provide reports to the District Attorney. For example: the Board of Elections must refer a matter to the District Attorney and make its files available if it believes a criminal violation has occurred *(see,* Election Law § 3-104 [3]); the director of a facility under the jurisdiction of the Offices of Mental Health is obligated by law to report crimes to the District Attorney and, upon consent of the appropriate Commissioner, the clinical records of patients

in mental health facilities must be provided to the District Attorney's office when necessary to the furtherance of a criminal investigation of patient abuse (Mental Hygiene Law § 7.21 [b]; § 33.13 [c] [9] [vi]); and the Superintendent of Insurance must report fraud to the District Attorney (Insurance Law § 405).

In *People v Flynn (supra),* the Court of Appeals rejected the defendant's argument that a motor vehicle accident report filed by the complainant with the Department of Motor Vehicles (DMV) was *Rosario* material. The defendant's argument in *Flynn* was based on the fact that the DMV performs some law enforcement functions and is involved in the adjudication of offenses resulting in fines and license revocations. The Court explicitly held that "[m]aterial in the possession of a State administrative agency, such as the Department of Motor Vehicles, is not within the control of a local prosecutor" *(People v Flynn, supra,* at 882). While it was not stated by the Court in *Flynn,* it is relevant to note that DMV investigators are designated as peace officers (CPL 2.10 [32]).

If the requirement that records be made available to the District Attorney's office, upon its request, were deemed to render such records under the "control" of the local prosecutor for *Rosario* purposes, then virtually every record in the possession of any City agency would be deemed to be under such control, since County Law § 932 provides District Attorneys with the right to obtain a copy of any record in any City agency. Section 932 of the County Law provides, in pertinent part, that every salaried officer of the City of New York and the counties it comprises "must, upon application therefor, furnish to the district attorney of any of the said counties, a certified or exemplified copy or transcript of, or extract from, or transcript of any writing, paper, record or document on file or recorded in his office, or of the return upon an execution, mandate or order, without the payment of any fee or charge whatsoever therefor". Clearly, neither the functions of the OCME as defined by the Charter and Administrative Code, not the requirements that it refer matters to the District Attorneys or provide their offices with its findings and other information, can be viewed as "prosecutorial functions" bringing the OCME under the control of local prosecutors.

We intimated as much in *People v Santiago* (200 AD2d 370, *lv denied* 83 NY2d 876). In that case, this Court held that the failure to preserve a blanket in which the deceased's body was

found wrapped "was attributable to the Medical Examiner's Office, not law enforcement personnel" *(supra)*. Moreover, the Second Circuit in *United States v Rosa* (11 F3d 315 [1993], *cert denied* — US —, 114 S Ct 1565) held that rule 803 (8) of the Federal Rules of Evidence, which provides, *inter alia,* that reports prepared by law enforcement personnel are not admissible at trial, did not apply to a written autopsy report prepared by an employee of the OCME. In *United States v Rosa,* the Second Circuit noted that while it had previously held in *United States v Oates* (560 F2d 45 [2d Cir 1977]) that chemists employed by United States Customs Service were " 'law enforcement personnel' " for the purposes of rule 803 (8) (B), it was "not persuaded that the term 'law enforcement personnel' as used in Rule 803 (8) (B) should be read to encompass employees of the Medical Examiner's Office" (11 F3d 315, 332, *supra)*. It was stated therein: "Unlike Customs, which has responsibility for enforcement of, *inter alia,* customs and narcotics laws, *see* 19 C.F.R. §§ 161.0, 161.2 (1993), the Medical Examiner's Office is required simply to investigate unnatural deaths; it refers a death bearing any indicium of criminality to the appropriate district attorney and has no responsibility for enforcing any laws, *see,* N.Y. City Charter Ch. 22 § 557 ('Charter'). The chief medical examiner and his assistants are required to be physicians and pathologists; there is no requirement in the Charter that they be attorneys or that any employees of the office have any law enforcement training. Even when a matter is referred to the district attorney because of an indication of criminality, the Charter does not give the medical examiner any responsibility for collecting evidence or determining the identity of the perpetrator. * * * [A] medical examiner's reported observations as to a body's condition are normally made as part of an independent effort to determine a cause of death. Indeed, ' "a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case" ' [citations omitted]". *(Supra,* at 332.)

Therefore, we hold that audiotapes made by the examining pathologist during the autopsy of the deceased are not *Rosario* material required to be produced by the People, since those tapes were not in their possession or control.

Accordingly, the order of Supreme Court, New York County (Edwin Torres, J.), entered October 13, 1993, which denied the defendant's motion to vacate the judgment of conviction ren-

dered by the same court and Justice on January 3, 1992, is unanimously affirmed.

ELLERIN, J. P., ASCH, RUBIN and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered October 13, 1993, unanimously affirmed.