OPINION OF THE COURT
Burton B. Roberts, J.
The defendant was convicted after a jury trial of 87 counts of depraved indifference murder, 87 counts of felony murder, one count of arson in the first degree and one count of assault in the first degree. On September 19, 1991, the defendant was sentenced to concurrent terms of 25 years to life on each of the 174 counts of murder, and concurrent terms of 25 years to life for the arson conviction and 5 to 15 years for the assault conviction. These convictions all resulted from the fire at the Happy Land Social Club on March 25, 1990.
On December 21, 1993, the defendant filed a CPL 440.10 motion to vacate his convictions on the ground that the People did not supply the audiotapes made by the medical examiners who performed the 87 autopsies conducted as a result of the fire.[1] The defendant contended that the tapes were Rosario material and the People were required to obtain the audiotapes from the Office of the Chief Medical Examiner (OCME) and to provide them to the defense. For the reasons that follow, the motion is denied.
I. BACKGROUND
A. The Crime and the Trial
On March 25, 1990, the defendant and his former girlfriend, Lydia Feliciano, who worked at the Happy Land Social Club as a hat checker, had an argument. Following that quarrel, the defendant purchased a dollar’s worth of gasoline, went to the social club and poured the gasoline into the club and then ignited it with a lighted match. This action started a fire that burned down the club and killed 87 people, making this crime one of the worst mass murders in the history of the United States.[2]
*952 When the case came to trial in July 1991, the defendant presented an insanity defense. He did not contest the issues of who started the fire or what caused the 87 victims’ deaths. This position was made clear right from the outset of the trial. In his opening statement, defense counsel said:
"Ladies and gentlemen, on March 25, 1990, Julio Gonzalez started the fire in the Happyland [sic] Social Club. You’ve all heard me concede that repeatedly. I’m conceding that he started the fire, I’m conceding that 87 people died as a result of that fire, no question as to who they were, no question as to how they died, no question that it was a horrible tragedy, almost beyond human imagination.
"I also concede that as a result of that fire Rubin Valladares was seriously injured, he was burned escaping from the building. But ladies and gentlemen, when Julio Gonzalez started that fire, he was legally insane. I’m using the term insane, you know the legal expression.
"That is the only issue I have addressed so far during voir dire, it’s the only issue I’m addressing now, it’s the only issue I will address with evidence during the trial, the only issue you will hear me refer to in my summation, it is the only issue I think you need seriously consider when you retire to deliberate.” (Transcript, at 36.)
True to his word, defense counsel did not question any of the witnesses called to identify the bodies of the 87 victims of the fire and he did not cross-examine any of the medical examiners who testified during the trial. He called two psychologists to present evidence concerning the insanity defense. Then, after the People called a psychologist and a psychiatrist in rebuttal, defense counsel in summation attacked the findings of the People’s medical experts and argued that the jury should find the defendant not guilty by reason of insanity. He did not make an issue of the cause of death or who had died. The jury rejected the defense of insanity and returned the verdict outlined above.
Before the medical examiners were called to testify, the parties tried to reach a stipulation that would obviate the need to hear testimony about the cause of death and the identification of all 87 victims. No stipulation was reached, however, because the defense was not willing to enter a stipulation if the People chose to present "police testimony or fire testimony” about the conditions in the social club after *953 the fire.[3] The People did not stipulate on the defendant’s terms because they believed the evidence they presented was necessary for a full understanding of the case. Consequently, the jury heard evidence from the medical examiners (M.E.s).
Only 7 of the 9 medical examiners who performed the 87 autopsies in this case testified at the trial. The People did not call Dr. Vernard Adams or Dr. Michael Ferenc, and Dr. John Pearl testified about the findings concerning the 25 victims whose autopsies were performed by either Adams or Ferenc. The defense agreed to this procedure because Drs. Adams and Ferenc would have had to come from other States to testify and it was agreed that the People could save the time and expense of producing these two doctors.[4]
Each of the seven medical examiners who testified described their backgrounds, including their education, their board certifications, their titles, their duties as M.E.s and the number of autopsies they had performed and observed.[5] They were all qualified as experts. Then, each M.E. described the first of the autopsies they testified about in some detail, explaining that the victim they examined died of smoke inhalation and how and why they reached that conclusion. All of the M.E.s testified that when a person is caught in a fire he or she breathes in smoke, which contains carbon monoxide. Carbon monoxide bonds more readily with hemoglobin in a person’s blood then does oxygen. Hemoglobin is the molecule that carries oxygen to the tissues and cells of the human body. Therefore, when carbon monoxide bonds with hemoglobin, it prevents a person from getting the oxygen needed to survive. The M.E.s each testified that they found soot inside the airways of the victims they examined, that the victims had a cherry pink discoloration of the skin that is characteristic of carbon monoxide poisoning and that the toxicology report showed high levels of carbon monoxide in the victims’ blood.
*954 After the more in-depth questioning, the testimony concerning the other victims examined by an M.E. fell into a pattern. The typical questioning is shown in the following example:
"q. Doctor, did you perform an autopsy under M.E. case number 1581 on an individual identified to you as Victor Cordova and with respect to this indictment those would be counts 44 and 131?
"a. Yes.
"q. Was this autopsy report made in the regular course of your business within a reasonable time after the completion of your autopsy?
"a. Yes, it was.
"mr. Warner (the prosecutor): I would ask that that report be marked in evidence as People’s 8-17.
"the court: Any objection?
"mr. berne (defense counsel): No objection.
"the court: Received in evidence * * *
"q. Dr. Pearl, based on your autopsy do you have an opinion as to the cause of death of this individual identified to you as Victor Cordova?
"a. Yes, I do.
"q. What is your opinion?
"a. He died of smoke inhalation.
"q. Is that opinion consistent with the findings you made during the course of your autopsy report?
"a. Yes, it is consistent with the autopsy and the toxicology findings.
"q. Are the findings that you made generally consistent with those that you have expressed earlier?
"a. Yes.” (Transcript, at 655-657.)
B. The CPL 440.10 Proceedings
After the defendant filed this CPL 440.10 motion, this court conducted several proceedings on the motion. On March 23, 1994, the parties agreed that they would subpoena all of the autopsy tapes and listen to them to determine if the tapes were simply duplicative equivalents of the reports. By August 16, 1994, the parties had listened to all of the tapes and compared them to the autopsy reports. They agreed to prepare *955 a joint report documenting the differences between the autopsy tapes and the autopsy reports.[6]
The defendant agreed, during the proceedings, that the People went to great lengths to provide discovery and that the voluminous discovery was provided to the defendant long before the hearing was held. Further, the defendant conceded that he never made an issue of the cause of death during the trial; his defense was insanity. Finally, the defendant conceded that he was not raising any Brady claim with respect to any of the autopsy tapes. And, although the court repeatedly invited defense counsel to do so, counsel refused throughout the proceedings to make an effort to show that his defense was somehow prejudiced because he did not receive the autopsy tapes. Counsel’s position was that the complete failure to turn over Rosario material is immune from harmless error analysis and thus he would not show prejudice.
On November 7, 1994, the prosecutors connected with the investigation and trial of this case filed affirmations in which they stated that they "had no knowledge that the Office of the Chief Medical Examiner maintained audiotapes that are dictated during autopsies.” Defense counsel, too, acknowledged during one of the proceedings that he did not know until some time after the jury reached its verdict that autopsy tapes were created by OCME.
On December 28, 1994, the Corporation Counsel of the City of New York on behalf of the Chief Medical Examiner of the City of New York filed a motion on notice to both parties seeking permission to appear as amicus curiae. The extent of OCME’s participation in the proceeding was to file along with its motion an affidavit of Charles S. Hirsch, the Chief Medical Examiner of the City of New York. The affidavit provides additional factual information about the functioning of OCME that was not brought out by the parties. Because OCME may be affected by the outcome of this proceeding, because the parties have not objected to the motion, and because the court determines that the affidavit is of special assistance to the court (see, 22 NYCRR 500.11 [e]), this court grants the motion to appear as amicus curiae.
*956 According to OCME, the Administrative Code of the City of New York was amended in 1961 to allow medical examiners, as an alternative to writing, to dictate their observations made during an autopsy. Contrary to popular belief, the pathologists’ observations are dictated after, not during, autopsies because several pathologists work simultaneously in the same room and because Federal and State environmental restrictions designed to guard against blood exposure make dictation in the autopsy room generally unfeasible. According to OCME, the authorization of dictation was made for administrative convenience and did not excuse the preparation of a written report containing medical findings and conclusions.
In the view of OCME, the final autopsy report consists of the transcript, reviewed and corrected by the pathologist who performed the autopsy, and the pathologist’s conclusions, which are added to the report after the pathologist has reviewed all the laboratory reports and examined the physical evidence. Sometimes the physical evidence is examined by a pathologist after the report is dictated and the findings based upon these observations are added to the autopsy report at a later time.
OCME considers the final autopsy report to be a record and stores the reports by borough and by chronological order in its records unit. By contrast, OCME considers the autopsy tape to be physical evidence and it is stored and administered through the Evidence Unit.
On February 3, 1995, this court conducted the final proceeding with regard to this motion. The purpose of this proceeding was to decide the outstanding issues with regard to claims unrelated to the autopsy tapes. In his original motion, the defendant claimed that the medical examiners in this case prepared an inventory of medicolegal case record, a personal identification of body report, a telephone notice of death, a supplemental case information report, a case worksheet, and handwritten notes pertaining to the autopsy for each of the 87 victims in this case. He averred that he did not receive these documents. The People disputed these allegations.
In order that the record be crystal clear on this point, this court asked the parties to go back to their files and review all of the material therein. On February 3, 1995, the parties reported their findings to this court. Defense counsel stated that he received 87 supplemental case information reports and 87 case worksheets.
*957 Further, defense counsel accepted the People’s representation, which was made on information and belief after conferring with OCME, that the medicolegal case report is a document prepared by a clerk that is simply a list of the material forwarded by OCME to the District Attorney’s office. Counsel conceded that this document is not Rosario material.
With regard to the telephone notice of death, defense counsel stated that he received 73 of these notices. He accepted the People’s representation that this document is also a clerical document. Further, he did not doubt that many of the victim’s relatives may not have had telephones and thus received no telephone notice of death.
Defense counsel acknowledged that he received the doctor’s handwritten notes for 78 autopsies. He accepted that the People turned over every document that they had in their possession and thus that they only received 78 handwritten notes from OCME. Further, defense counsel said he did not know if any other notes exist and he admitted that he had no evidence that the doctors made notes with regard to the nine instances in which no notes were disclosed to the defense.
Finally, with regard to the personal identification of body report, defense counsel acknowledged that he and the prosecutor who collected all of the discovery in this case agreed that those forms would not be disclosed to the defense because they contained the names and addresses of the family members of the victims, who expressed concern about the release of this information.
II. FINDINGS AND CONCLUSIONS
A. Precedent Requires That the Motion Be Denied
In People v Rosario (9 NY2d 286, 289, cert denied 368 US 866 [1961]), the Court of Appeals held that the People must provide the defense with all pretrial statements of prosecution witnesses as long as the prior statements relate to the subject matter of the witness’s testimony and are not privileged. The remedy when the People fail to comply with this rule is per se reversal of the conviction. (People v Jones, 70 NY2d 547, 551 [1987]; People v Ranghelle, 69 NY2d 56, 63 [1986]; People v Perez, 65 NY2d 154, 159-160 [1985].) The rule applies on direct appeal and on CPL 440.10 motions brought before the direct appeal is exhausted. (People v Jackson, 78 NY2d 638 [1991]; People v Novoa, 70 NY2d 490 [1987].)
*958 Nevertheless, both the First and Second Departments have held that the Rosario rule does not apply to autopsy tapes in the possession of the Office of the Chief Medical Examiner. (People v Smith, 206 AD2d 102 [1st Dept 1994], Iv granted Dec. 8,1994 [Murphy, P. J.]; People v Nova, 206 AD2d 132 [1st Dept 1994]; People v Washington, 196 AD2d 346 [2d Dept], Iv granted 83 NY2d 1008 [1994].) The essential rationale of these decisions is that OCME is not a law enforcement agency that can be considered to be constructively controlled by the People. Instead, OCME is an independent agency affiliated for administration purposes with the New York City Department of Health. Its function is not to bring criminal charges but to give an impartial scientific determination of the cause of a person’s death. (People v Smith, 206 AD2d, at 111, supra; People v Washington, 196 AD2d, at 350, supra.)
The holdings in Smith and Washington (supra) require that this court deny the defendant’s CPL 440.10 motion, and the defendant’s motion is denied on the authority of these cases. Because both of these cases are pending in the Court of Appeals, which could reverse these decisions, this court also denies this motion for the following reasons.
B. Twenty-Two Counts Involve Duplicative Equivalents
In Ranghelle (69 NY2d, at 63, supra), the Court of Appeals talked of the strong presumption of discoverability under the Rosario rule. Nevertheless, the Court has recognized exceptions to the rule. For instance, there is no error when the People fail to turn over statements that are the "duplicative equivalents of statements previously turned over to the defense”. (People v Consolazio, 40 NY2d 446, 454 [1976], cert denied 433 US 914 [1977].) The duplicative equivalent rule has been strictly interpreted by the Court of Appeals. Statements are not duplicative equivalents merely because they are consistent; they must be the same. (People v Young, 79 NY2d 365, 370 [1992]; People v Ranghelle, 69 NY2d, at 63, supra; People v Cecora, 186 AD2d 215, 216 [2d Dept 1992]; People v West, 185 AD2d 160 [1st Dept 1992].)
In this case, the defendant concedes that there are 11 autopsy reports covering 22 homicide counts that are identical to their corresponding autopsy tapes. Accordingly, there is no ground to vacate counts 3, 17, 21, 41, 58, 63, 64, 65, 67, 73, 86, 90, 104, 108, 128, 145, 150, 151, 152, 154, 160, and 173.
The strictness of the duplicative equivalent rule lends itself *959 to a bizarre result. Most of the differences between the tapes and the reports brought to this court’s attention are so minor that one is hard pressed to say that the distinctions amount to differences. For instance, when she tape-recorded her report concerning the autopsy of Nohemy Aracely, Dr. Bloom said the "lower face shows fine skin petechial.” On the written report, this phrase was typed as the "lower face shows fine petechial.”[7] Similarly, the skin color of Elias Colon was reported on the tape as having "pink cherry red discoloration”; on the written report it is "pink cherry discoloration.” The defendant does not concede that these two autopsy tapes are duplicative equivalents of their written reports. There are other examples involving other trifling, meaningless differences. And, indeed, although it does violence to the longstanding doctrine of de minimis non curat lex, this court is obliged to follow the rulings of the Court of Appeals and declare that these examples and all of the other trivial differences do not come within the duplicative equivalent rule.[8]
C. Seventy-Two Counts Do Not Involve Material within the Definition of the Rosario Rule
1. Two of the Witnesses Who Tape-Recorded the Autopsy Tapes Did Not Testify at Trial
As is clear from the opinion in Rosario itself, the prosecution duty extends only to witnesses the People call at trial. (People v Rosario, 9 NY2d, at 289, supra; Matter of Christopher W., 202 AD2d 305 [1st Dept 1994]; People v Bowman, 191 AD2d 225 [1st Dept], Iv denied 81 NY2d 967 [1993]; People v Whitely, 164 AD2d 782 [1st Dept], Iv denied 76 NY2d 945 [1990].) If a medical examiner dictates a tape but does not testify at trial, the tape is not Rosario material. (People v Ford, 211 AD2d 438 [1st Dept 1995].)
At the trial, the People did not call either Dr. Adams or Dr. *960 Ferenc. These M.E.s performed a total of 25 autopsies. But five of Dr. Adams’ autopsy tapes were identical to the autopsy reports turned over to the defense and are thus duplicative equivalents. With regard to the remainder, there is no ground to vacate 40 counts involving a total of 20 victims. The motion to vacate counts 6, 7, 10, 12, 14, 15, 20, 28, 29, 31, 35, 36, 37, 38, 39, 41, 47, 57, 77, 84, 93, 94, 97, 99, 101, 102, 107, 115, 116, 118, 122, 123, 124, 125, 126, 128, 134, 144, 164, and 171 is denied.[9]
2. There Is Undisclosed, Nonduplicative Material That Did Not Relate to the Subject Matter of the Witness’s Testimony
In order to be Rosario material, the material at issue must relate to the subject matter of the witness’s testimony. (People v Perez, 65 NY2d, at 159, supra; People v Kanefsky, 50 NY2d 162 [1980]; People v Rosario, 9 NY2d, at 289, supra; People v Nixon, 166 AD2d 170 [1st Dept 1990], Iv denied 78 NY2d 971 [1991]; People v Fridman, 162 AD2d 136 [1st Dept], Iv denied 76 NY2d 893 [1990]; People v Fluellen, 132 AD2d 455 [1st Dept], Iv denied 70 NY2d 874 [1987].) This requirement concerning subject matter is codified into CPL 240.45 (1) (a), which requires the People to make available to the defense any written or recorded statement "made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness’s testimony”.
Before trial, the defendant was given copies of the autopsy reports for every victim. During the proceedings on this motion, the parties compared the previously undisclosed autopsy tapes to the autopsy reports and prepared a blueprint mapping any differences between the tapes and the reports. Undoubtedly because the autopsy reports are meant to be a transcript of the dictated autopsy tapes, almost everything that was said on the autopsy tapes was transcribed into the autopsy reports. The defendant therefore received the vast bulk of information in the autopsy tapes because the autopsy *961 reports that were furnished supplied the very same information. To this extent, no Rosario violation could have occurred because the tapes merely duplicated the reports.
Further, to the extent that there are differences between the tapes and the reports, the failure to disclose the tapes containing these differences could amount to a Rosario violation only if the differences were related to the subject matter of the medical examiner’s testimony. The defendant has no right to immaterial and irrelevant prior statements. (Cf, People v Poole, 48 NY2d 144 [1979] [if there is a dispute over whether the prosecutor’s file contains Rosario material, the defendant is not entitled to unrestricted access to the entire file, the defendant is only entitled to that information that a court determines is related to the subject matter of a witness’s testimony].) Indeed, had this court been called upon to review the autopsy tapes at the end of the medical examiners’ direct testimony and determined that the matter not disclosed in the autopsy tape was irrelevant, it would have been entirely appropriate to redact those portions of the tapes instead of handing it over to the defense.
There are 32 counts involving 16 victims in which the differences between the autopsy tape and the autopsy report involved some item or items that did not relate to the subject matter of the M.E.s’ testimony. The subject matter of the medical examiners’ testimony was their background and expertise, their opinions with respect to the cause of death of the victims, and the basis of their opinions. As set out above, the medical examiners gave testimony in a rather rote fashion. After describing one of the autopsies they performed in some detail, the medical examiners would simply state the cause of death of the other victims they examined and testify that their opinions regarding the cause of death were based upon the observable characteristics of smoke inhalation and the toxicology reports showing a large amount of carbon monoxide in the blood.
The matters comprising the differences can only be described as trivial and irrelevant. The medical examiners were not asked about the age of the victim, or how much a particular organ weighed,[10] or what was sent to the toxicology lab, or *962 whether there was a dull lacquer on a victim’s nails or whether the victim had “yellowish green gallstones” instead of “yellow green gallstones.” Similarly, the instructions they dictated to the typist were not subject to questioning. These are the matters that are found on the autopsy tapes but not transcribed onto the reports. Accordingly, there is no ground to vacate counts 4, 5, 8, 13, 18, 27, 32, 44, 46, 60, 61, 62, 66, 75, 83, 87, 91, 92, 95, 100, 105, 114, 119, 131, 133, 147, 148, 149, 153, 162, 170, and 174, which all involved these kinds of differences.
D. The Remaining 80 Homicide Counts, Involving 40 Victims, Need Not Be Vacated Because Any Holding That Autopsy Tapes Are Rosario Material Should Be Purely Prospective.
There are 52 counts involving 26 victims where, when referring to the cause of death on the autopsy tape, the medical examiner used the words "acute carbon monoxide poisoning due to” before “smoke inhalation.” By contrast, in the report, the cause of death is listed simply as "smoke inhalation.” These counts of the indictment would fall within the scope of the Rosario rule if the Court of Appeals were to reverse the Appellate Divisions’ holdings in People v Smith, People v Nova and People v Washington (supra). These statements are clearly related to the central subject matter of the M.E.s’ testimony — how and why 87 victims of the Happy Land fire died.
Likewise, there are 22 counts involving 11 victims in which the undisclosed autopsy tapes would be Rosario material because they contained variations from the autopsy reports concerning the cause of death other than that mentioned in the previous paragraph. Finally, there are six counts concerning three victims in which the undisclosed autopsy tape contained some statement about the name of a victim. For instance, Query Romero is referred to as Francisco Romero on the autopsy tape. The name of each victim was indeed part of the medical examiners’ testimony.
Thus, all told, there are a total of 80 counts involving 40 victims for which the defendant could be entitled to relief if *963 the Court of Appeals overrules the Appellate Divisions and extends the Rosario rule to cover autopsy tapes in the possession of OCME. However, even if the Rosario rule were to apply, it should be applied in a purely prospective fashion, and there is no ground to vacate these 80 counts.
When confronted with a newly announced rule of law, a court must consider the threshold question of retroactivity, weighing three basic factors: (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect on the administration of justice of retroactive application of the law. (People v Favor, 82 NY2d 254 [1993]; People v Mitchell, 80 NY2d 519 [1992]; People v Pepper, 53 NY2d 213, cert denied 454 US 967 [1981].) A "new” rule is created when there is such a sharp break in the continuity of law that its impact will wreak more havoc in society than society’s interest in stability will tolerate. Similarly, a departure from the general rule of retroactive application may be warranted where a court’s recent holding represented a dramatic shift away from customary and established procedure.[11]
Although OCME has been making autopsy tapes since 1961, the practice has been not to turn over the tapes to either the prosecution or the defense. OCME does not consider the tape part of the final autopsy report. Indeed, the parties in this case were not aware of the practice of making audiotapes at the time this trial was conducted. The kind of cases effected by a rule that would require the turnover of autopsy tapes are homicides, the most serious crimes found in our Penal Law. If the Rosario rule were to encompass autopsy tapes, at the very least every murder or manslaughter conviction that is pending on direct appeal would be at risk. It is estimated that there are at least 200 homicide cases in the City of New York in which audiotapes were not furnished to the defense. These cases include some of the most notorious crimes in recent memory, the 1990 murder of Brian Watkins, the Utah tourist, the 1989 murder of Dr. Katherine Hinnant at Bellevue Hospi *964 tal and this case.[12] In the Bronx alone, the District Attorney’s office has answered 41 CPL 440.10 motions involving autopsy tapes.[13]
This potential certainly would wreak havoc in our society. It is appropriate that any ruling requiring the People to turn over autopsy tapes be prospective only. (People v Ford, 211 AD2d 438 [1st Dept 1995] [Kupferman, J., concurring], supra; People v Jones, NYLJ, Feb. 8, 1994, at 23, col 3 [Sup Ct, Kings County], adhered to on rearg 1994 WL 96985 [Mar. 8, 1994].)
Consequently, there is no ground to vacate counts 1, 2, 9, 11, 16, 19, 22, 23, 24, 25, 26, 30, 33, 34, 42, 43, 45, 48, 49, 50, 51, 52, 53, 54, 55, 56, 59, 68, 69, 70, 71, 72, 74, 76, 78, 79, 80, 81, 82, 85, 88, 89, 96, 98, 103, 106, 109, 110, 111, 112, 113, 117, 120, 121, 129, 130, 132, 135, 136, 137, 138, 139, 140, 141, 142, 143, 146, 155, 156, 157, 158, 159, 161, 163, 165, 166, 167, 168, 169, and 172.
E. There Is No Basis for Vacating the Two Nonhomicide Counts
In addition to the 174 murder counts, the defendant was convicted of arson in the first degree and assault in the first degree. None of the medical examiners gave testimony that in any way affects the validity of these two counts. Accordingly, there is no ground for vacating counts 175 and 178. (People v Baghai-Kermani, 84 NY2d 525 [1994].)[14]
*965 F. There Was No Rosario Violation with Respect to Any of the Other Documents the Defendant Initially Claimed Were Not Furnished to Him
In his original motion, the defendant claimed that the medical examiners in this case prepared an inventory of medicolegal case record, a personal identification of body report, a telephone notice of death, a supplemental case information report, a case worksheet, and handwritten notes pertaining to the autopsy for each of the 87 victims in this case and he claimed that he did not receive these documents. At the proceeding on February 3, 1995, the defendant conceded that he received all of the supplemental case information reports and the case worksheets. Accordingly, the claim as to these two documents is denied. (CPL 440.30 [2].)
The defendant’s claims with regard to the medicolegal case reports and the telephone notices of death are also denied. Defense counsel conceded that these documents are clerical documents and are not Rosario material.
With regard to the doctors’ handwritten notes of the autopsies, defense counsel conceded that he received the notes of 78 autopsies. He accepted the People’s representation that they turned over every one of the doctors’ notes that they received from OCME. These are the only notes proven to exist. Defense counsel conceded that he had no evidence that the doctors made notes with regard to the nine autopsies in which no notes were disclosed to the defense. These concessions require that the claim with regard to the doctors’ notes be denied. The defendant received the notes in 78 of the 87 autopsies and, with regard to the other 9, he did not establish an essential fact to support his claim — that the notes were ever prepared. (CPL 440.30 [4] [b].)
Lastly, there is no basis to vacate any counts of the indictment because of a failure to disclose the personal identification of body reports. At the hearing, the defense counsel conceded that he agreed that these reports would not be disclosed because they contained personal information about the victims’ families. The defense thus affirmatively waived its right to receive these documents. (People v Rashid, 164 AD2d *966 951, 952 [2d Dept], Iv denied 76 NY2d 943 [1991]; see, People v Jackson, 78 NY2d 900, 901 [1991]; People v Sierra, 169 AD2d 682, 683 [1st Dept], Iv denied 78 NY2d 974 [1991].)
The motion to vacate the defendant’s convictions is denied.

. The defendant also claimed that he did not receive six different kinds of documents that he alleged were prepared by the medical examiners and were Rosario material. This claim is addressed infra.

. By macabre coincidence, March 25, 1990, the date the fire was set, was the 79th anniversary of one of the worst fires in New York City history, the Triangle Shirtwaist Company fire, which killed 146 people.

. Counsel summarized his position as follows: "|T]f the probative point of telling the jury what the cause of death was, that 87 people died, and that these are the people’s names, that [tjhere is no contest, then I would stipulate, but if the People wanted to add anything beyond that as you put it to give it the flavor which to my point of view is to inflame and prejudice the jury, then, fine. If that’s their choice that’s what is going to happen, then I’m not going to make it easy by stipulating.” (Transcript, at 578-579.)

. Dr. Adams was the Chief Medical Examiner in Tampa, Florida, at the time of trial, and Dr. Ferenc was employed by the San Francisco Medical Examiner’s Office at the time of trial.

. In addition to this information, the first M.E. to testify, Dr. Tamara Bloom, explained what a pathologist was and what an autopsy was.

. The report is contained in the memorandum of counsel. Although the report is meant to be a joint report, there are several minor variations between the defense and prosecution version of the report. Because the parties agreed, during the October 21, 1994 proceeding, that the particular variations were not significant, the court did not compare the tapes to the reports in order to settle these minor disputes.

. Petechial is defined in Webster’s Ninth Collegiate Dictionary as "a minute reddish or purplish spot containing blood that appears in skin.” Therefore there is really no difference between "skin petechial” and "petechial”; the use of the word skin on the autopsy tape is redundant.

. Under the de minimis doctrine, "the law does not concern itself with trifles” (1 Am Jur 2d, Actions, §58 [1994]); "the law does not care for, or take notice of, very small or trifling matters.” (Black’s Law Dictionary 388 [6th ed 1979].)

. This is not to say that the defendant was not entitled to the data used by Dr. Adams and Dr. Ferenc to form their opinions about the cause of death in this case. Under People v Davis (196 AD2d 597 [2d Dept 1993]) and People v Freshley (87 AD2d 104 [1st Dept 1982]), the defendant was entitled to this material, but not as Rosario material. Rather, the information would be available as discovery. The failure to provide discovery material, as opposed to Rosario material, is subject to harmless error analysis. The defendant made no effort to establish prejudice in this case and, indeed, cannot establish prejudice in this case. Thus, there is no basis for vacating these counts or any of the other counts in the indictment because the autopsy tapes were not turned over as part of discovery.

. A particularly common difference between the autopsy tape and the autopsy report was that the word "weigh” or "weighs” was omitted from the tape but typed into the report. For instance, with regard to Daisy Falco, in the report Dr. Pearl wrote "Kidneys weigh 150 each”; on the tape he omitted the word "weigh” and simply stated "Kidneys 150 grams each.”

. Such a situation existed after the Court of Appeals held in People v Antommarchi (80 NY2d 247 [1992]) that the defendant had a right to be present at the Bench during all sidebar questioning of jurors concerning their ability to fairly judge a case. This holding changed the all but universal practice of excluding the defendant from bench conferences with prospective jurors. The holding would have resulted in many, many cases being reversed. As a result, the Court of Appeals held in People v Mitchell (80 NY2d 519 [1992]) that the holding of Antommarehi could only be applied prospectively from the date of that decision.

. DeStefano, Medical Examiners Tapes Could Create a Sticky Situation, NY Newsday, Nov. 26,1993, at 43.

. Affirmation of Assistant District Attorney Lisa Mudd, filed Nov. 28, 1994.

. The Baghai-Kermani case held that the per se rule of reversal for Rosario error does not compel automatic reversal of all counts that happen to he tried jointly with the counts to which the undisclosed Rosario material pertained. Instead, the Court held that whether "an error in the proceedings relating to one count requires reversal of convictions on other jointly tried counts is a question that can only be resolved on a case-by-case basis”. (People v Baghai-Kermani, supra, at 532.)
An analysis of the facts in this case demonstrates that there would be no basis for reversing the 94 homicide counts where there was no Rosario violation. The defendant by his actions and words did not contest either the identity of the victims or their cause of death.